**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | |
|---|---|
| **MELINDA GOGGINS, et al.,** | ] |
| | ] |
| **Plaintiff(s),** | ] |
| | ] |
| **vs.** | ]   **CIVIL ACTION NO.:** |
| | ]       **03-VEH-2775-W** |
| | ] |
| **KEITH HANNAH, et al.,** | ] |
| | ] |
| **Defendant(s).** | ] |

**Memorandum of Opinion**

## I.    INTRODUCTION

This is civil case filed on October 9, 2003, by the Plaintiffs, Melinda Coggins and Kayla Coggins[1], against the Defendants Keith Hannah, Keith Crofford, and Michael Shane Coggins.  *Complaint*, at 1.  The First Amended Complaint, filed on January 20, 2004, sues Defendants Hannah and Crofford, both public officials, in their individual and official capacities.   The Amended Complaint alleges five counts including "Unlawful Traffic Seizure and Detention – 42 U.S.C. 1983" (Count I); "Negligent and Reckless Infringement of the Plaintiffs' Civil Rights" (Count II); "Conspiracy" (Count III); "Willful and Malicious Actions" (Count IV); and "False Imprisonment, Assault and Battery" (Count V).

---

[1]Kayla Coggins's action is brought by and through her mother and next friend, Melinda Coggins, as Kayla Coggins is a minor.

By order of July 6, 2004, Counts IV and V were dismissed against Defendants

Hannah and Crofford in both their individual and official capacities.

The case is now before the Court on Defendants Hannah and Crofford's

Renewed Motion for Summary Judgment. (Doc. 41).  For the reasons stated herein,

the Motion will be **GRANTED**.  Summary Judgment will also be **GRANTED** to

Defendant Shane Goggins.

## II.    SUMMARY JUDGMENT STANDARD

In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th

Cir. 2004).

## III.    FACTS[2]

For the last twenty (20) years, the Bibb County Sheriff's Department has been

enforcing visitation orders when asked to do so by a parent.  The enforcement would

---

[2]The facts, as stated herein, are set out and considered, as the Court must, in the light most favorable to the non-movant.  Where appropriate, the Court notes important disagreements in the facts.

entail retrieving the child from one parent and handing the child over the other parent.

Plaintiff Melinda Goggins and Defendant Shane Goggins are the parents of Plaintiff Kaylae Goggins.  Shane and Melinda Goggins were divorced on June 9, 2004.  The Final Judgment gave the parties joint custody of Kaylae with Ms. Goggins receiving primary custody of the child.  With respect to visitation, the Final Judgment provided in relevant part:

2.   <u>Visitation</u>

[Shane Goggins] shall have reasonable visitation with the minor children [sic], said reasonable visitation to be agreed upon by the parties. ***However, if the parties are unable to agree on the visitation of the parties minor children,*** [sic] ***then visitation shall be as follows:***

> A.   ***Every other weekend from 5:30 p.m. on Friday until 5:30 p.m. on Sunday, beginning January 7, 2000.***
>
> . . .
>
> D.   One (1) week each summer month with (30) days notice to [Melinda Goggins] of his intent to exercise said visitation from 8:00 p.m. on Sunday until 6:00 p.m. on the Saturday [sic].
>
> E.   Special visitation shall take precedence over weekend visitation. ***Should either party have the minor child for two (2) weekends in a row, then the other party shall have visitation with the minor child on the third (3rd) weekend, at which time the every other weekend visitation shall resume.***

Kaylae's parents did not have much trouble interpreting the Final Judgment prior to 2003.  According to Mr. Goggins, the only dispute was whether he was

entitled to two or three weeks of visitation with Kaylae. Ms. Goggins testified that the parties never came to an agreement that special visitation for the summer would always begin on Wednesdays, but that it only happened sometimes. [3]

Some time in May 2003, Shane Goggins provided a handwritten note to Ms. Goggins indicating to her the dates he would like to have summer visitation.[4] Ms. Goggins testified that she interpreted the note to mean that Shane wanted summer visitation for a week beginning on the dates listed on the note.

Ms. Goggins testified that she offered Mr. Goggins the entire week of July 20th, Sunday through Saturday, for visitation. She told Mr. Goggins that he could not begin his July week of visitation with Kaylae on Wednesday, July 21st, because it would interrupt the weeklong gospel meetings at their church. [5] Ms. Goggins offered Mr. Goggins the entire week of July 20th, from Sunday to Saturday, as per the final judgment of divorce, and would not deviate from the final judgment because she wanted Kaylae to attend all or none of the revival services at the church.

---

[3]Defendants contend that "They also modified the parenting plan contained in the Final Judgment by agreement beginning in 2002 when Melinda suggested that Shane start his week-long summer visitation on Wednesday instead of Sunday. Id. at p. 71, lns. 7-22." *Motion for Summary Judgment*, at 2.

[4]Ms. Goggins does not recall how she actually received the note, but she does admit receiving it in May, 2003.

[5]The Defendants characterize the evidence as follows: "Ms. Goggins subsequently informed Shane that the June date was acceptable, but the July date was not because of a church meeting that was to take place that week. Id. at p. 23, lns. 2-11. Ms. Goggins based her refusal on the ground that the Final Judgment did not authorize visitation to begin in the middle of the week. Id. at lns. 16-21." *Motion for Summary Judgment*, at 2-3.

Mr. Goggins's request to begin his special week of visitation in the summer on a Wednesday was a deviation from the court ordered visitation. Ms. Goggins believed that if the request had been in accordance with the Final Judgment she "would have had no choice."

Kaylae called her father on Wednesday, July 23, 2003, and informed him that she was not coming because she had a gospel meeting. Mr. Goggins later called Ms. Goggins and told her not to worry about the week-long visitation, he would just pick Kaylae up on Friday in accordance with the regular weekend schedule. Mr. Goggins testified that he did so in order to salvage a vacation he had planned with his parents. Ms. Goggins refused to allow Mr. Goggins to have his regular weekend visitation on the grounds that she already had plans. Mr. Goggins informed Ms. Goggins that if she did not comply with the Final Judgment he would take it to the Bibb County Sheriff's Department and have them enforce it.

All of the evidence in the record demonstrates that the weekend of Friday, July 25, 2003, was Mr. Goggins's weekend visitation. At her deposition, Plaintiff Melinda Goggins produced her calendar that she used to track Mr. Goggin's visitation with Kaylae. Beginning in January 2003, Ms. Goggins marked an "S" on her calendar for the weekends he had visitation with Kaylae, and "M" for the weekends that Kaylae remained with her. The alternating weekends continue throughout the year of 2003

5

without interruption or change – Shane Goggins's week of visitation in June, 2003, took place over his regularly scheduled weekend.   In fact, Plaintiff Melinda Goggins's own calendar had July 25, 2003, marked as Shane Goggins's weekend for visitation.  At some point in time, Ms. Goggins marked over the "S" with an "M".

On Thursday, July 24, 2003, Mr. Goggins called his attorney, Ted Hellums, to obtain advice on what to do.  Mr. Hellums told the Plaintiff to go to the regular place where they usually exchanged Kaylae at the time indicated in the Final Judgment.  If Ms. Goggins did not show up, Mr. Goggins was to go to the Bibb County Sheriff's Department, make a report, and then go get Kaylae.

When Ms. Goggins did not arrive at 5:30 p.m. on July 25, 2003, Mr. Goggins next went to the West Blocton Police Department and filed a report.  It was Mr. Goggins's understanding that the West Blocton Police Department could not do anything about the situation because it took place outside of the city limits.  Consequently, Mr. Goggins was informed by the officer that he would have to contact the Sheriff's Department.

By coincidence, on July 25, 2003, the Bibb County Sheriff's Department and the West Blocton Police Department were conducting joint drug operations.  Officers and deputies participating in the operation met at the West Blocton police station.  Sheriff Hannah and Deputy Crofford were two of the individuals at the station.

After completing the aforementioned report, Mr. Goggins saw Sheriff Hannah, walked up to him, and explained his situation.[6]   Sheriff Hannah looked at the Final Judgment and asked Deputy Crofford to join the conversation.   Sheriff Hannah and Deputy Crofford reviewed the Final Judgment of Divorce and Mr. Goggins explained to both Hannah and Crofford why he thought he was supposed to have visitation with Kaylae that day.   Sheriff Hannah was aware that Mr. Hellums, who had previously been the Bibb County Attorney, represented Mr. Goggins and had been involved in the Goggins's divorce.   Sheriff Hannah introduced Mr. Goggins to Deputy Crofford and explained to Deputy Crofford that Mr. Goggins and Ms. Goggins were having a custody dispute that involved the Final Judgment.[7]   Sheriff Hannah showed the Final Judgment to Deputy Crofford and then asked him to go with Shane Goggins and see if he could "get this resolved and straighten this out."   Deputy Crofford read the Final Judgment.

Mr. Goggins informed Deputy Crofford that Ms. Goggins was in church. However, Deputy Crofford did not feel that it would be proper to go into the church to question her.   Consequently, the two men went to wait outside of Ms. Goggins's church until she left.   Deputy Crofford testified that "the Sheriff said well, just go up there and wait until she gets out of church, you know, and see if you can find out

---

[6]Sheriff Hannah and Shane Goggins had spoken earlier about the matter on the telephone.

[7]Prior to this time, Deputy Crofford and Shane Goggins had never met one another.

what's going on."[8]  They arrived in separate vehicles between 7:30 p.m. and 8:00 p.m. While they waited, Mr. Goggins talked to Deputy Crofford about the situation with Ms. Goggins, and other unrelated topics such as hunting, and fishing.

After approximately 90 minutes, people began leaving the church.  Mr. Goggins identified Ms. Goggins's van.  Deputy Crofford instructed Mr. Goggins to remain at the scene and started following Ms. Goggins's van.[9]  Nevertheless, Mr. Goggins followed Deputy Crofford in his vehicle.

After following Ms. Goggins for approximately one-and-a-half miles, Deputy Crofford called the dispatcher to check the van's license plate.  When he was informed that it belonged to Ms. Goggins, he activated his blue lights and began a traffic stop.  Deputy Crofford testified that his intent was to let Ms. Goggins get a sufficient distance from the church to avoid embarrassing her.  It is undisputed that Crofford had no traffic-related reason to pull Ms. Goggins over, and was not conducting any criminal investigation of her.  Deputy Crofford also testified in his deposition:

> Q.     Do you agree with me it probably would have been better if you had talked to Ms. Goggins at her home as opposed to on the side

---

[8]The Plaintiff cites this exact section of the Deposition for the proposition that Crofford "testified that he was to take Kaylae away from Melinda and give her to Shane." *Plaintiff's Statement of Facts*, at 3.  The evidence cited does not support the Plaintiff's contention.

[9] Shane Goggins testified that he was not told to remain at the church but was told to follow Deputy Crofford and remain in his truck.  S. Goggins Depo. p. 128, lns. 2-3.

of the road?

\* \* \*

A.     Looking back at everything, yeah.

\* \* \*

Q.     You didn't pull her over for any kind of traffic related reason, did you?

A.     No, sir.

Q.     You pulled her over strictly because Shane Goggins had gone to the Sheriff and the Sheriff had told you to talk to Ms. Goggins?

A.     Yes.

Q.     . . . Is that correct?

A.     Yes, sir.

Q.     All right.  And there was no other – you had no other reason for pulling her over?

A.     No, sir.

*Crofford Deposition*, at 60-61.

The stop occurred at Stinnet's Enterprises – a well-lit area – at 9:47 p.m. Crofford approached Ms. Goggins on the driver's side of her van and asked her to get out of the van.  After she complied, Deputy Crofford asked her name and if the child in the van was Kaylae.  Deputy Crofford's intent was to have the conversation outside of the hearing of Kaylae in order to avoid upsetting the child.  During the discussion

between Crofford and Ms. Goggins, when Ms. Goggins answered that she did have Kaylae with her, Crofford said, "I'm taking her with me." When Ms. Goggins answered, "No, sir," Crofford told her, "Well, if I don't, you're going to jail." During the traffic stop, while Ms. Goggins was holding Kaylae, Crofford also told Kaylae, "You're going with me; you're going with me."

In the meantime, Mr. Goggins had stopped his vehicle behind Deputy Crofford's patrol car. Ms. Goggins saw Mr. Goggins's vehicle as she got to the back of the van and became "emotional." According to Ms. Goggins, Deputy Crofford told her that it was Mr. Goggins's weekend for visitation and that Kaylae would be coming with him. Ms. Goggins refused. Deputy Crofford showed the Final Judgment to Ms. Goggins and asked her to explain to him what she believed it meant. Ms. Goggins grabbed the document, read it, and handed it back. She was obviously angry. According to Ms. Goggins, when she started to explain, Deputy Crofford told her to shut her mouth and that he knew how to do his job.[10] During at least a portion of the stop, Kaylae was in the car, very upset, kicking and beating the seats of the car.

As these events were unfolding, Ms. Goggins's brother Darren Odom arrived on the scene. Darren Odom stopped and got out of his vehicle. He walked past Mr.

---

[10]Deputy Crofford's testimony differs sharply from Melinda Goggins's testimony with respect to how the traffic stop occurred.

Goggins's vehicle, pointed at him, stated that he was going to "whoop [Mr. Goggins's] ass," and then walked toward Ms. Goggins and Deputy Crofford.  He also arrived just as Deputy Crofford allegedly told Ms. Goggins to shut her mouth.  He objected to the way Deputy Crofford was treating his sister.  As he did so, he got close to Deputy Crofford.  Deputy Crofford asked him to back up, and eventually to "get off [Deputy Crofford's] traffic stop."  When Mr. Odom  refused, Deputy Crofford informed him that if he did not, he would be arrested for obstruction of governmental operations.  Mr. Odom  still refused to comply and remained in close proximity to Deputy Crofford.  Deputy Crofford called for assistance and threatened to use pepper spray if Mr. Odom continued to refuse to comply.  Mr. Odom finally walked back to his vehicle, pulled it forward, and stopped it approximately 30 feet in front of Ms. Goggins's van.  He then got back out, remained at the side of his vehicle, and watched Deputy Crofford.

Approximately six minutes later, the first backup units arrived.  Officers from West Blocton and deputies from the Bibb County Sheriff's Department eventually arrived.  In the meantime, both Mr. Odom and Ms. Goggins were using their cellular telephones.  Soon, friends and members of their family began arriving on the scene.  These included Ms. Goggins's parents and the pastor of her church.

In the meantime, Ms. Goggins went back to the van and told Kaylae what was

11

happening.  Kaylae got out of the van and stood with Ms. Goggins.  Ms. Goggins then indicated that she had no desire to discuss the matter further with Deputy Crofford and requested to speak with Sheriff Hannah.[11]  Melinda Goggins and her family were friends and political supporters of Sheriff Hannah.  While Sheriff Hannah also knew the Goggins family, he testified that he was closer to Ms. Goggins's family than he was to Mr. Goggins's family.  Sheriff Hannah and Ms. Goggins had known one another for approximately 20 years.  Deputy Crofford relayed Ms. Goggins's request to Sheriff Hannah, who was already on his way to the scene in response to Deputy Crofford's request for assistance.

Sheriff Hannah arrived approximately 15 to 20 minutes after Deputy Crofford initiated the traffic stop.  Hannah continued to detain Ms. Goggins and Kaylae for an additional forty-five minutes after his arrival on the scene.  Hannah first approached Crofford and asked him what was going on, and Crofford responded that "Melinda would not give him the child" and told him of Odom's actions.  Hannah spoke to Ms. Goggins and continued to tell her that Kaylae was supposed to go with Mr. Goggins.  At that point, Deputy Crofford did not have any further involvement with Ms. Goggins.  Sheriff Hannah immediately began trying to sort out the situation.  Sheriff

---

[11]In her deposition, Melinda Goggins testified that she could not remember whether she made such a request, but she conceded that she may have done so.

Hannah went and spoke with Darren Odom who complained that Deputy Crofford had spoken harshly to his sister and that he wanted Deputy Crofford fired or he would sue.

Sheriff Hannah then went to Melinda Goggins and discussed the situation with her. Sheriff Hannah obtained a copy of the Final Judgment, read it, and told Ms. Goggins the Order was like nothing he had ever seen before. Ms. Goggins stated that the Final Judgment was prepared that way in order to ensure Kaylae went to various church functions. She also stated that it was her turn to have the child that weekend.

As Sheriff Hannah and Ms. Goggins were discussing the situation, Ms. Goggins's father, Burt Odom, arrived on the scene. Sheriff Hannah left Ms. Goggins and went to speak with him. Burt Odom also complained about Deputy Crofford's behavior. The two men then went back to where Ms. Goggins was standing behind the van.

Sheriff Hannah asked Ms. Goggins if he could speak with Kaylae. When Ms. Goggins agreed, Sheriff Hannah asked the child if she wanted to go with her mother or father. Kaylae stated that she wanted to leave with her mother. In response, Sheriff Hannah asked if Kaylae would like to tell her father what she wanted. When Kaylae said "yes," Sheriff Hannah told Ms. Goggins about the conversation. Keith Whatley, a Bibb County Deputy Sheriff, asked Ms. Goggins if Kaylae could go speak

13

to her father, and Ms. Goggins agreed.  Kaylae was then taken back to Mr. Goggins's truck where she got in and spoke with him for five to ten minutes.

When Kaylae was done speaking to her father, Sheriff Hannah informed Ms. Goggins that she was free to go.  After Kaylae had spoken to Mr. Goggins and returned to Ms. Goggins's van, Ms. Goggins asked Hannah, "Am I going to have to worry about this happening to me all the time?," and Hannah replied that "he couldn't tell me 'no.'"  (Ex. A, M. Goggins depo. at 119:8-22.)

In the light most favorable to the Plaintiff, the entire duration of the stop was between one hour, forty-five minutes, and two hours.  Once Ms. Goggins and Kaylae left, Mr. Goggins and Deputy Crofford remained on the scene to complete an incident report.  In the Report, Crofford stated that the specific offense committed was "Contempt of Court Order."  It is undisputed between the parties that, prior to this incident, no court had found Ms. Goggins to be in violation of any court order, and that no court had determined that Ms. Goggins was in contempt of court.  In the I/O Report, Crofford also stated:

> Based on papers signed by Judge Jones that juvenile daughter was to be in the custody of Mr. Goggins every other weekend and this being his normal weekend for said visitation, it was deemed that said child was to be taken from the mother and handed over to the father.

> During traffic stop Melinda Goggins refused to release child to the father even after the order had been read to her and she herself read it at the scene.  She said "You are not taking this child anywhere."

Throughout the entire incident, Melinda Goggins was not placed under arrest. No one touched her in any fashion.  She was never placed in handcuffs.  Regarding the stop, Sheriff Hannah testified:

> Q.   Sitting here today, can you tell me any legal basis for Deputy Crofford to have pulled Melinda over and stopped her on the side of the road?
>
> * * *
>
> A.   Today – today I cannot see any.
>
> Q.   Okay.  Sitting here today, can you tell me any legal basis for Deputy Crofford to have detained Melinda for her estimation of approximately an hour?
>
> A.   Sitting here today, I do not see where she should have been pulled over.
>
> Q.   Okay.  Sitting here today, can you tell me any legal basis for you keeping her there an additional 35 minutes?
>
> A.   No I cannot.
>
> Q.   Sitting here today, can you tell me any legal basis for this event to have ever even occurred?
>
> A.   No sir, I cannot.

*Hannah II Deposition*, at 169-170.

After this event, two changes occurred, one in the Bibb County Sheriff's Department and one in the custody arrangement between Shane and Melinda Goggins.  With respect to the Sheriff's Department, Sheriff Hannah instituted a new

15

policy for deputies to deal with similar situations. Prior to this time, the Bibb County Sheriff's Department's Policy and Procedures Manual (hereinafter "Manual") did not have specific instructions for dealing with child custody disputes. The Sheriff's Department only dealt with less than five such events a year. They had never had a situation similar to the one underlying this lawsuit.

Sheriff Hannah changed the department's policy orally shortly after the incident. Sheriff Hannah later placed this policy in writing and added it to the Manual. The new policy forbids deputies from becoming involved in child custody disputes unless: (1) they have a clear court order to do so; or (2) a child's safety is endangered.[12]

Shane Goggins filed a modification action in the Circuit Court of Bibb County after the incident underlying the Plaintiffs' Amended Complaint.[13] This action resulted in a new Order modifying the Final Judgment. The new Order spells out exactly how visitation is to take place. Since the new Order went into effect, Mr. and Ms. Goggins have had no further problems with visitation.

Both Sheriff Hannah and Deputy Crofford believed they were properly

---

[12]The Plaintiff contends that "Sheriff Hannah had previously testified that the policy didn't change until February 27, 2004, when he issued a memorandum to his deputies. (Ex. D, March 25, 2004 Deposition of Keith Hannah ("Hannah I") at p.48:13-23; 49:1-23; 50:1-7; Ex. E, February 24, 2005 Deposition of Keith Hannah ("Hannah II") at p. 22:11-17; Def. Evid., Exhibit N)." *Plaintiff's Statement of Facts*, at 3-4. The cited sections do not support this assertion.

[13] However, the incident underlying this lawsuit was not mentioned in the modification petition.

performing their duties at the time of the aforementioned incident.  When asked what he expected Deputy Crofford to do in this situation, Sheriff Hannah testified that he expected Deputy Crofford to enforce the Final Judgment and uphold the law.  Both Sheriff Hannah and Deputy Crofford believed they were investigating a charge of contempt of court and/or interference with custody.  Furthermore, both men believed the Final Judgment they were provided gave them the authority to take the actions that they took on the night of July 25, 2003.  These Defendants were attempting to mediate the dispute and stop the situation from escalating further.  However, Hannah testified that Ms. Goggins and Kaylae were stopped and detained to enforce the Final Judgment of Divorce.  Crofford testified that his authority to stop and detain Ms. Goggins and Kaylae was based upon the Final Judgment of Divorce.

## IV.    ANALYSIS

The remaining Counts of the Amended Complaint[14] all sound in 42 U.S.C. § 1983, against Hannah and Crofford in both their individual and official capacities. All claims allege that the Defendants violated, or conspired to violate, the Plaintiffs' rights under the Fourth and Fourteenth Amendments of the Constitution.

### A.    The Fourteenth Amendment Claims

The Defendants first move, and the Plaintiffs agree, that all claims based upon

---

[14]After the dismissal of Counts IV and V on July 6, 2004.

the Fourteenth Amendment are inappropriate.  Accordingly, the Motion for Summary

Judgment as to the Plaintiffs' claims, to the extent these claims are based upon the

Fourteenth Amendment, will be **GRANTED**.

### B.    Qualified Immunity

The Defendants next argue that, to the extent the remaining claims are brought

against them in their individual capacity, they are entitled to Qualified Immunity.

### 1.    Complete Protection to Governmental Officials Sued in Their Individual Capacity

"Qualified immunity offers complete protection for government officials
sued in their individual capacities if their conduct 'does not violate
clearly established statutory or constitutional rights of which a
reasonable person would have known.' " *Vinyard v. Wilson,* 311 F.3d
1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S.
800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

*Wood v. Kesler,* 323 F.3d 872, 877 (11th Cir. 2003).

### a.    Purpose of Qualified Immunity

"The purpose of this immunity is to allow government officials to carry
out their discretionary duties without the fear of personal liability or
harassing litigation, protecting from suit all but the plainly incompetent
or one who is knowingly violating the federal law." *Lee v. Ferraro,* 284
F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations
omitted).

*Wood,* 323 F.3d at 877.

That qualified immunity protects government actors is the usual rule;
only in exceptional cases will government actors have no shield against

claims made against them in their *individual capacities. Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (officials "generally are shielded from liability for civil damages"); *Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.1989) ("The *Harlow* decision sets up a bright-line test that is a powerful constraint on causes of action under section 1983."); *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323- 24 (11th Cir.1989) (when "no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where [First Amendment case law] would lead to the inevitable conclusion that the [act taken against] the employee was unlawful"). Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit. *See Malley v. Briggs,* 475 U.S. 335, 341-43, 106 S.Ct. 1092, 1096-97, 89 L.Ed.2d 271 (1986). Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.

*Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146, *1149 (11th Cir. 1994)

> While qualified immunity almost always applies in damage claims against government actors in their individual capacities, the defense is a narrow one, leaving plaintiffs other avenues of relief. Plaintiffs remain free (subject to Eleventh Amendment constraints) to seek money damages against government actors in their official capacity. Plaintiffs may also seek injunctive relief.

*Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146, *1149 n. 2 (11th Cir. 1994)

### b.   How a Defendant Can Get It

### (1)   Burden Shifting Analysis

To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority

when the allegedly wrongful acts occurred." *Id.* (internal quotation marks omitted). . . . "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.*

*Id.*

### (a)   Defendants' Burden to Prove Scope of the Officials' Discretionary Authority

The Eleventh Circuit Court of Appeals has recently restated the law as follows:

Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities. Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize. *See \*1266 Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1185 n. 17 (11th Cir.1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties *and* within the scope of this authority." (emphasis added)).

One might reasonably believe that violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government official's authority or power. As we explained in *Harbert Int'l, Inc. v. James,* 157 F.3d 1271, 1282 (11th Cir.1998) (quotation marks and citation omitted), however, "the inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.

Consider the first prong of the test--whether the official is engaged in a

20

legitimate job-related function. In *Sims v. Metropolitan Dade County,* 972 F.2d 1230 (11th Cir.1992), "we did not ask whether it was within the defendant's authority to suspend an employee for an improper reason; instead, we asked whether [the defendant's] discretionary duties included the administration of discipline." *Harbert,* 157 F.3d at 1282. Similarly, in assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures *in general* is a part of his job-related powers and responsibilities. *See, e.g., Madiwale v. Savaiko,* 117 F.3d 1321, 1324 (11th Cir.1997). Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen with his legitimate job description.

Of course, we must be sure not to characterize and assess the defendant's act at too high a level of generality. Nearly every act performed by a government employee can be described, in general terms, as ostensibly "furthering the public interest." If we jump to such a high level of abstraction, it becomes impossible to determine whether the employee was truly acting within the proper scope of his job-related activities. Consequently, we consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint. In considering whether an act of allegedly excessive force fell within a police officer's duties, for example, we do not ask whether police have the right to use *excessive* force. We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest. We instead ask whether they have the power to attempt to effectuate arrests. *See, e.g., Ferraro,* 284 F.3d at 1194 (holding, in an excessive force suit, "there can be no doubt that [the police officer defendant] was acting in his discretionary capacity when he arrested [plaintiff]").

After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second prong of the test and determine whether he is executing that job-related function--that is, pursuing his job-related goals--in an authorized manner. The primary purpose of the qualified immunity doctrine is to allow government

21

employees to enjoy a degree of protection only when exercising powers that legitimately form a part of their jobs. *See, e.g., Harlow,* 457 U.S. at 819 & n. 34, 102 S.Ct. at 2739 & n. 34 (limiting the availability of qualified immunity to situations where "an official's duties legitimately require action" and to "actions within the scope of an official's duties"). Each government employee is given only a certain "arsenal" of powers with which to accomplish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.

Employment by a local, county, state, or federal government is not a *carte blanche* invitation to push the envelope and tackle matters far beyond one's job description or achieve one's official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity.

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 -1267 (11th Cir. 2004).

> (b)   **Plaintiffs' Burden to Show Qualified Immunity Not Appropriate**
>
> i)   **Whether the Plaintiffs' Allegations, If True, Establish a Constitutional Violation.**

The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

*Wood*, 323 F.3d at 877 -878.

> ### ii)    Was the Right Clearly Established?

> However, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.' " *Vinyard,* 311 F.3d at 1346 (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151).

*Id.* at 878.

> For a "right" to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (emphasis added). "[I]n the light of pre-existing law the unlawfulness must be apparent." *Id.* As the en banc court recently explained:

>> When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. *See, e.g., Edwards v. Gilbert,* 867 F.2d 1271, 1277 (11th Cir.1989). Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.

> *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,* 998 F.2d 923 (11th Cir.1993). Put differently, "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993).

*Rodgers v. Horsley,* 39 F.3d 308, 310 -311 (11th Cir. 1994) (finding no clearly

established right where Plaintiff had failed to show that at the time of the alleged tort

the law was clearly established because she pointed to no bright line established by pre-existing case law that would make it "apparent" to the defendants that what they were doing (or failing to do) was unlawful).  If there is no such bright line shown, a plaintiff can overcome qualified immunity  "only by showing that the official's conduct lies so obviously at the very core of what the [law] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw."  *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir. 1997).

### 2.     Qualified Immunity Analysis Applied

#### a.     Discretionary Authority

As noted, the Defendants begin with the burden of proving that they were acting within the scope of their discretionary authority.  The Plaintiffs contend that "Alabama law does not give a sheriff or his deputies authority to unilaterally enforce visitation arrangements."  *Plaintiffs' Opposition to Motion for Summary Judgment*, at 3 (citing Ala. Code § 36-22-3).  The Plaintiffs argue that because these powers are not spelled out in Alabama law, and because neither the Sheriff, nor his deputy were ordered by a court to enforce the decree, the stop was not within the Sheriff's discretionary authority.

However, it is clear that Sheriff's deputies have a duty to investigate what they believe to be a violation of law.  It is undisputed that Sheriff Hannah and Deputy

Crofford had such a belief.  Accordingly, their actions fell within their discretionary authority.

### b.    Plaintiffs' Burden

Even if the Defendants violated the Plaintiff's constitutional rights, in order to avoid the defense of qualified immunity, the Plaintiff must show that the right was clearly established.  For a "right" to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (emphasis added). "[I]n the light of pre-existing law the unlawfulness must be apparent." *Id.*

The law in this case is not so sufficiently clear that the unlawfulness of the stop should have been clearly apparent to the Defendants.

### c.    Conclusion

The defense of Qualified Immunity applies to bar the Section 1983 claims against Defendants in this matter.  For that reason, the Defendants' motion for Summary Judgment on all claims will be **GRANTED**.

### C.    Punitive Damages

The Defendants also argue that punitive damages are inappropriate in this case. Punitive damages may be assessed in a Section 1983 action "when the defendant's

conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). In addition to the facts stated above, the Plaintiffs state that Ms. Goggins had once asked for assistance from the Sheriff's Department on a visitation dispute and was told that there was nothing they could do. This fact, however, taken together with the facts viewed in the light most favorable to the Plaintiffs, do not meet the standard for an award of punitive damages. No reasonable jury could find on the facts of this case that the Defendants' conduct was motivated by evil motive or intent, or that it involved reckless or callous indifference to her federally protected rights. Accordingly, even if Summary Judgment were not appropriate as to all remaining claim, the Motion for Summary Judgment as to all claims for punitive damages should be **GRANTED**.

### D.    Claims for Injunctive Relief

The Defendants correctly point out that the Plaintiffs lack standing to seek injunctive relief against Defendants in their official capacity. The only reasons that the Plaintiffs give to establish standing are that: 1) at the time of the incident, Sheriff Hannah told Ms. Goggins that he could not tell her that an incident like this could not happen again; and 2) the Sheriff's office is attempting to participate in some way in the divorce and visitation case.

26

In order to have standing, the "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). There is no evidence that this standard has been satisfied. The Plaintiffs therefore have no standing to seek injunctive relief.

Accordingly, even if the Motion for Summary Judgment on all remaining claims was denied, the Motion as to the claims for Injunctive Relief should be **GRANTED**.

### E.    Conspiracy

The Defendants last correctly argue that there is no evidence of a conspiracy in this case. The parties agree that the Plaintiffs must show (1) the Defendants reached an understanding ***to deny the Plaintiffs their rights***; (2) that the conspiratorial acts impinged on federal rights; and (3) an actionable wrong exists to support the conspiracy. *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990). By its plain language, to satisfy the first element the Defendants must have ***specifically*** reached an understanding to deny the Plaintiffs' rights. There is absolutely no evidence in the record that these Defendants reached that kind of an understanding.

The Motion for Summary Judgment will be **GRANTED** as to the Conspiracy claims.  As this is the only charge left against Mr. Goggins, the Court sees no reason to delay entry of Summary Judgment as against him also, although he is not a party to this motion.  Summary Judgment will be **GRANTED** as to all claims against Shane Goggins.

DONE this 8th day of June, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

28